IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNESTO A UC ENCARNACION,<br><br>Petitioner,<br><br>v.<br><br>POLLY KAISER, et al.,<br><br>Respondents. | Case No. 22-cv-04369-CRB<br><br>**ORDER GRANTING TEMPORARY RESTRAINING ORDER** |

Petitioner Ernesto Uc Encarnacion (Uc) has filed an ex parte motion for a temporary restraining order (TRO) in this immigration habeas case. See Mot. for TRO (dkt. 2). Given the nature of this case and the real concern that Respondents[1] may detain Uc at any moment, the Court finds it appropriate to rule on the motion without first obtaining a response from Respondents.

## I. BACKGROUND

### A. Personal and Criminal History

Uc is a Mexican national who has lived in the United States for approximately 15 of the last 24 years. Uc Decl. (dkt. 1-2) ¶¶ 3–9. During his childhood, his parents shuttled him back and forth between Mexico and the United States; he experienced verbal and physical abuse, and beatings and brandings by his uncles, who were leaders in the local Surenos gang. Id. ¶¶ 3, 5. At 18, he returned to the United States to work and build a

---

[1] Respondents are Polly Kaiser, Acting Field Office Director of the San Francisco Field Office, U.S. Immigration and Customs Enforcement (ICE), Tae D. Johnson, Acting Director of ICE, Alejandro Mayorkas, Acting Secretary of Department of Homeland Security (DHS), and Merrick B. Garland, United States Attorney General, Department of Justice. Id. at 1.

better life for his son. Id. ¶ 6.

In 2008, he was arrested for a crime that he says he did not commit—the charges were dismissed—transferred to ICE custody, and deported to Mexico. Id. ¶ 7. He was then tortured and beaten by police in Mexico, and harassed by "a vigilante community patrol group," who tried to lynch him, vandalized his home, and injured his son. Id. ¶ 9. He fled the area but was "accidentally shot" by cartel members; he then returned to the United States in 2016. Id.

Depressed, Uc became homeless and began using controlled substances. Id. ¶ 10. He was convicted of three misdemeanors and a felony between 2018 and 2020. Id. ¶ 11, Ex. S (DHS Bond Evidence). He was convicted of carrying a dirk or dagger and of taking a vehicle, an electric bike, without consent. Id. He was also convicted of false imprisonment with violence, a felony, when he was under the influence of drugs and had an altercation with his girlfriend while driving. Id. ¶ 12. She wanted him to stop the car and let her out, but he continued driving until they got to San Francisco. Id. The San Mateo district attorney filed a criminal restraining order against him, which he violated in December 2019 when his girlfriend, who was sick, called and asked him to take her to the pharmacy. Id, ¶ 13. He told his probation officer about it and turned himself in. Id.

### B. Immigration Proceedings before the IJ

After serving 45 days in jail for the probation violation, Uc was transferred to ICE custody. Id. ¶ 14; Mahoney Decl. (dkt. 1-1) ¶ 12. His 2011 removal order was reinstated pursuant to 8 U.S.C. § 1231(a)(5), and, after expressing a fear of returning to Mexico, Uc was placed in proceedings in San Francisco Immigration Court to pursue Withholding of Removal and relief under the Convention Against Torture. Id.; Ex. M (Notice of Referral to Immigration Judge). The reinstated removal order subjected Uc to mandatory detention under 8 U.S.C. § 1231(a)(6).

During his proceedings, Uc appeared before former IJ Nicholas Ford. Mahoney Decl. ¶ 14. He asserts that IJ Ford mistreated him in a variety of ways before ultimately finding him not credible, denying all relief, and ordering him removed. Id.; Ex. N (IJ

2

Order in Removal Proceedings). Uc timely appealed, and his removal proceedings remain on appeal before the BIA. Id. ¶ 15, Ex. O (EOIR Case Status Printout).

While that case progressed, Uc was held in ICE custody at the Yuba County Jail for six months pursuant to the mandatory detention provisions of 8 U.S.C. § 1231(a)(6). Mot. for TRO at 5. He then became eligible for a bond hearing pursuant to Aleman Gonzalez v. Sessions, 325 F.R.D. 616, 620–29 (N.D. Cal. 2018), aff'd Aleman Gonzalez v. Barr, 955 F.3d 762 (9th Cir. 2020), rev'd Garland v. Aleman Gonzalez, 142 S. Ct. 2057 (2022).

On August 4, 2020, a different IJ conducted a bond hearing. Mahoney Decl. ¶ 16, Ex. U (Bond Order of the IJ). Under Aleman Gonzalez, ICE had the burden of proving by clear and convincing evidence that Uc was either a danger to the community or a flight risk. 325 F.R.D. at 628. ICE and Uc submitted evidence to support their positions. Mahoney Decl. ¶¶ 17–18, Exs. S (DHS Bond Submission), T–X (Selected Documents from Bond Hearing). Uc's submission included documents from his withholding proceedings, a psychological evaluation diagnosing him with PTSD, Major Depressive Disorder, Generalized Anxiety Disorder, and Substance Use Disorder in Early Remission, as well as letters of support from family and community members, evidence about the unreliability of gang databases, and evidence of Uc's participation in Alcoholics Anonymous. Id. Uc also submitted evidence of his release plan, which included enrollment in the Latino Commission Program (TLC), a "comprehensive residential treatment program that promised to provide Mr. Uc with Spanish-language wraparound services including education and counseling on anger management, domestic violence, and relapse prevention." Mahoney Decl. ¶ 18, Ex. V (Evidence of Uc Release Plan).

At the bond hearing on August 4, the IJ admitted all of the evidence. Mahoney Decl. ¶ 19. She heard arguments from both parties, and testimony from Uc and from Eduardo Tirado Garcia, a case management specialist in San Mateo County who worked with Uc for eight months. Id. ¶¶ 21–25; Ex. U (Letter from Eduardo Tirado Garcia). The IJ found that ICE had not met its burden to show that Uc was a continued danger or flight risk, and granted him release on bond of $2,000. Id. ¶ 26. She also noted the

3

comprehensive release plan and Uc's family and community ties as factors that would mitigate any dangerousness or flight risk. Id.

DHS did not move to stay the IJ's decision. Id. ¶ 27. Uc posted bond and was released on August 5, 2020. Id. ¶ 28. He reported directly to the Latino Commission, where he lived until June 2022. Id. ICE appealed the IJ's bond decision in August 2020. Id. ¶ 29, Ex. R (BIA Order Revoking Bond). After ICE appealed, the IJ issued a memorandum decision explaining her analysis in granting bond. Ex. Q (Bond Memorandum of IJ, 9/2/2020). The IJ emphasized that "the impetus for [Uc's] criminal activity was his use of methamphetamine," which had ceased. Id. The IJ also pointed to Uc's strong support network, and his long residence and family ties in San Francisco. Id.

### C. Conduct After Release on Bond

Following his release on bond, Uc participated in the Latino Commission's education, therapy, and programming well beyond the 90-day residential program to which he was initially admitted. Ex. I (Latino Commission certificates). He graduated from TLC's inpatient program on November 2, 2020, and then enrolled in its residential, outpatient, and ongoing education programs, from which he graduated in June 2022. Id. He participated in weekly counseling and group sessions and in Alcoholics Anonymous. Id. He was "consistent" throughout his treatment and "committed to staying connected with his goals and aspirations." Id.

Uc completed probation on May 13, 2022. Ex. H (Letter from Probation Dept.). As terms of his probation, he completed a domestic violence education program as well as a six month drug and alcohol education program. Id.

In the last two years, he also reconnected with his family. Uc Decl. ¶¶ 24–30. He reunited with his girlfriend, who is also now sober, and they got married. Ex. F (Marriage Certificate). They regularly attend Alcoholics Anonymous and volunteer in their community. Uc Decl. ¶ 29, Ex. K (Letter in Support). He does yard and construction work, and works with his wife walking dogs. Id. ¶ 25. Uc is also the primary caregiver for his mother, Gregoria Encarnacion Ramos, who is elderly and suffers from a number of

serious medical conditions that restrict her mobility, require her to attend many doctor's visits, and require several medications.  Id. ¶ 24, Exs. E (Ramos Decl.), J (Evidence re Mother's Medical Conditions).

### D. Immigration Proceedings Before the BIA

Nearly two years passed since ICE appealed the bond order.

On June 23, 2022, the BIA sustained ICE's appeal, vacating the IJ's bond order, and ordered Uc detained without bond.  Ex. R (BIA Order Revoking Bond).  The order purported to apply a "clearly erroneous" standard for findings of fact, stating: "we agree with DHS that the [IJ] clearly erred in granting the respondent bond because it met its burden of establishing that the respondent is a danger to the community."  Id.  The BIA held that the IJ "did not properly consider the recency, seriousness, and dangerous nature of the respondent's criminal history and her assessment of the respondent's future dangerousness is clearly erroneous."  Id.  And it concluded that Uc's sobriety and his family ties "do not mitigate his dangerousness such that he should be released."  Id.  In assessing his present dangerousness, the BIA did not consider Uc's conduct in the two years that passed since his release on bond.  Id.

On July 15, 2022, Uc was notified that his bond obligor had received a notice from ICE ordering that the obligor produce Uc for an appointment at the San Francisco ICE ERO Field Office on August 2, 2022 at 10:00 A.M.  Mahoney Decl. ¶ 6, Ex. A (Notice to Obligor).  Uc is afraid of being detained again, saying "[i]t would traumatize me and everyone in my life all over again."  Uc Decl. ¶ 32.  He asserts that he is "a different person now and I am proud of my sobriety," and "not a danger to anyone," and he asks "for the opportunity to remain free so that [he] can continue supporting [his] family and building a life that [he is] proud of."  Id.

### E. Present Motion

Uc filed a habeas petition on July 28, 2022, see Pet. (dkt. 1) and a Motion for a TRO, see Mot. for TRO.  He asks the Court to "enjoin Respondents from re-detaining him unless and until he has had a hearing, as required by the Due Process clause of the Fifth

Amendment, to determine whether his re-detention by [ICE] would be lawful." Mot. for TRO at 1.

## II. LEGAL STANDARD

The same standard applies to a motion for a TRO and a motion for a preliminary injunction. See Martinez Franco v. Jennings, 456 F. Supp. 3d 1193, 1196–97 (N.D. Cal. 2020). A plaintiff seeking either remedy must establish (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. See id. at 20. Alternatively, the moving party must demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," and that the other two Winter elements are met. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)). The "[l]ikelihood of success on the merits is the most important Winter factor." Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks omitted).

A movant seeking an issuance of an ex parte TRO must also satisfy Rule 65(b), which requires a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and certification of "efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. Proc. 65(b)(1)

## III. DISCUSSION

The Court concludes that Uc's showing supports the issuance of a TRO.

### A. Likelihood of Success

Uc argues that he is likely to succeed on the merits of his claim, or has raised serious questions going to the merits of his claim, on two grounds: the Constitution requires that he have a hearing with an IJ prior to any re-detention by DHS; and he cannot be re-detained pursuant to the BIA's order revoking bond because the order violates Due Process and is legally infirm. See Mot. for TRO at 11, 18. The Court will not address the

second ground herein because it concludes that Uc has satisfied the standard as to the first ground.  See Jorge M.F. v. Wilkinson, No. 21-cv-14340JST, 2021 WL 783561, at *2, n.2 (N.D. Cal. March 1, 2021) (doing the same).  That is, Uc has raised serious questions going to the merits as to his claim that (1) he has a protected liberty interest in his conditional release, and (2) that liberty interest requires that he receive a hearing before an IJ prior to re-arrest and revocation of bond.  See Romero v. Kaiser, No. 22-cv-2508, 2022 WL 1443250, at *3 (N.D. Cal. May 6, 2022) (concluding that "there are 'serious questions' going to the merits of Petitioner's claim that the Due Process Clause of the Fifth Amendment requires a hearing before an IJ prior to re-detention.").

### 1. Liberty Interest

Uc argues that "'[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of that liberty that [the Due Process Clause protects.'"  Mot. for TRO at 11 (quoting Zadvydas v. Davis, 533 U.S. 678, 690 (2001)).  He maintains that he has been exercising that freedom for nearly two years, and that "[w]hile that freedom may ultimately be revocable should circumstances materially change . . . he nonetheless retains a weighty liberty interest under the Due Process Clause of the Fifth Amendment in avoiding re-incarceration."  Id.  Numerous courts in this district agree.  See, e.g., Jorge M.F., 2021 WL 783561, at *3, Ortiz Vargas v. Jennings, No. 20-cv-5785-PJH, 2020 WL 5517277, at *2 (N.D. Cal. Sept. 14, 2020); Ortega v. Bonnar, 415 F. Supp. 3d 963, 969–70 (N.D. Cal. 2019).  Judge Orrick, in Ortega, explained that "[j]ust as people on preparole, parole, and probation statue have a liberty interest, so too does Ortega have a liberty interest in remaining out of custody on bond."  415 F. Supp. 3d at 969–70 (citing Morrissey v. Brewer, 408 U.S. 471, 482 (1972)).  This is consistent with Morrissey, which noted that a parolee "has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions," and observed that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and

often on others." 408 U.S. at 482.[2]

### 2. Hearing

"The Court usually has held that the Constitution requires some kind of a hearing before the State deprives a person of liberty or property." Zinermon v. Burch, 494 U.S. 113, 127 (1992). The Court in Ortega applied the balancing test from Mathews v. Eldridge, 424 U.S. 319 (1976) to determine what process was due to a noncitizen released on bond before he can be re-detained. See Ortega, 415 F. Supp. 3d at 970. Mathews directs a court to consider three factors as part of the due process inquiry: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

The Court concludes that the three Mathews factors support a pre-detention hearing. See Jorge M.F., 2021 WL 783561, at *3 (citing Ortega, 415 F. Supp 3d at 970; Ortiz Vargas, 2020 WL 5074312, at *3). First, Uc "has a substantial private interest in remaining on bond," see Ortega, 415 F. Supp. 3d at 970. He is living with his wife, working, and acting as the primary caregiver for his mother. Uc. Decl. ¶¶ 24–30. Second, there is a "risk of an erroneous deprivation" and a value to the "procedural safeguards" he seeks. See Jorge M.F., 2021 WL 783561, at *3. The procedure in place now is a BIA order that among other things did not take into account Uc's conduct in the last two years when it reversed the IJ's finding on dangerousness. See Ex. R. There may well be value in a hearing with an IJ that takes into account Uc's entire history prior to any re-detention. Finally, "the government's interest in re-arresting [Uc] without a hearing before an IJ is

---

[2] An individual maintains a protectable liberty interest even where he obtains his liberty through a mistake of law or fact. See Hurd v. District of Columbia, Government, 864 F.3d 671, 683 (D.C. Cir. July 28, 2017). This principle undermines any argument the government might make that Uc's release order was erroneous under Garland v. Aleman Gonzalez, 142 S. Ct. 2057.

low." See Ortega, 415 F. Supp. 3d at 970.  There is no reason to believe that a delay in detaining Uc means that the government will be unable to detain him at a later date.  The BIA order left unchallenged the IJ's conclusion that Uc is not a flight risk.  See Exs. Q, R. Uc has strong community ties, has remained in the area in the two years that he has been out on bond, and has expressed a fear of returning to Mexico.

As in Jorge M.F., the Court concludes that Uc 'has raised serious questions on the merits of his claim that he is entitled to a pre-deprivation hearing before an [IJ] if he is re-arrested,' and has satisfied the first Winter factor."  See 2021 WL 783561, at *3.

### B.     Other Factors

The Court next turns to the remaining Winter factors.

The Court concludes that Uc is likely to suffer various forms of immediate and irreparable harm unless it issues a TRO.  As in Jorge M.F., "[a]bsent injunctive relief, [Uc] could be taken into ICE custody at any time and his bond would be cancelled."  Id.; see also Mahoney Decl. ¶ 9 ("if Mr. Uc is detained, even for a day, his bond will be cancelled.  Based on my personal knowledge . . . it can take months to receive the money back from a cancelled bond.  Thus, even if he were to be granted a new bond, it would be difficult for Mr. Uc's family or community to pay that bond given that ICS would still have the money from the old bond, not having returned it yet.").  He will not be able to work and support his family.  Us therefore faces severe economic hardship.  In addition, absent injunctive relief, his mother "would immediately lose his daily support, suffering irreparable harm."  Mot. for TRO at 22.  Uc would likely suffer emotional harm if re-detained.  See Uc Decl. ¶ 32 ("[i]t would traumatize me and everyone in my life all over again.").  His recovery depends upon his family and community support, and re-detention could disrupt that recovery.  See id., Ex. I.  And, finally, the deprivation of constitutional rights "unquestionably constitutes irreparable harm."  Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)); see also Hernandez v. Sessions, 872 F.3d 995, 995 (9th Cir. 2017) (referencing "the irreparable harm imposed on anyone subject to immigration detention").

9

When the government is a party, the "balance of the equities" and "public interest" factors merge. See Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014). Uc faces significant hardships absent a TRO (including a possible violation of his constitutional rights, a separation from his wife and from his mother, and psychological harm that could impact his recovery from substance abuse), while the government faces mere delay. See Romero, 2022 WL 1443250, at *3 ("any impact on Defendants would be minimal."). Moreover, the public has an interest in ensuring that Uc is not re-detained improperly: "it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." Ariz. Dream Act. Coa. v. Brewer, 757 F.3d 1053, 1069 (9th Cir. 2013) (quoting Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013)); see also Ortiz Vargas, 2020 WL 5074312, at *4 ("public has a strong interest in upholding procedural protections against unlawful detention.").

Uc has thus satisfied the remaining Winter factors, and so the Court GRANTS the motion for a TRO.

### C. Ex Parte and Security Issues

The Court further finds that "specific facts . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant" if the Court waits to issue the TRO until Respondents have been heard in opposition. Uc "could be taken into ICE custody at any time absent injunctive relief." Jorge M.F., 2021 WL 783561, at *3. Indeed, his counsel declares that "the very act of giving notice to Respondent ICE is likely to result in Mr. Uc's re-arrest, which is the very action that Mr. Uc is seeking to avoid, and asserts is unlawful." Mahoney Decl. ¶ 10.

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any part found to have been wrongfully enjoined or restrained." Fed. R. Civ. Proc. 65(c). A court has discretion "as to the amount of security required, if any." Jorge M.F., 2021 WL 783561, at *4

(quoting Johnson v. Couturier, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis in original)).  Here, as in Jorge M.F., see id., in light of the $2,000 bond that Uc already posted before the IJ, the Court declines to order the posting of security.

## IV.     CONCLUSION

For the foregoing reasons, the Court GRANTS the motion for a TRO and ENJOINS Respondents, and their agents and employees, from re-detaining Uc without notice and a hearing.  Such injunction shall take effect immediately and last until August 12, 2022, or further order of this Court.  The habeas petition, TRO, and this order must be served on Respondents such that they receive actual notice by August 1, 2022 at 2:00 P.M.

In addition, Respondents are ORDERED TO SHOW CAUSE by August 5, 2022 why a preliminary injunction should not issue enjoining Respondents from re-detaining Uc without notice and a hearing as ordered herein.  Uc may file a reply on or before August 8, 2022.  The hearing will proceed by Zoom webinar.

This order is issued on July 29, 2020 at 6:07 P.M.

**IT IS SO ORDERED.**

Dated: July 29, 2022

_____
CHARLES R. BREYER
United States District Judge